JOHN T. PHILIPSBORN - SBN 83944
Law Offices of JOHN T. PHILIPSBORN
507 Polk Street, Suite 350
San Francisco, CA 94102
(415) 771-3801
jphilipsbo@aol.com

MARTÍN ANTONIO SABELLI - SBN 164772
Law Offices of MARTIN SABELLI
740 Noe Street
San Francisco, CA 94114-2923
(415) 298-8435
msabelli@sabellilaw.com

Attorneys for BRIAN WAYNE WENDT

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>      Plaintiff,<br><br>vs.<br><br>JONATHAN JOSEPH NELSON, et al.,<br><br>      Defendants. | **Case No. CR-17-00533-EMC**<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF WENDT DEFENSE (1) *IN LIMINE* MOTION TO EXCLUDE EVIDENCE TECHNICIAN OR FORENSIC EXAMINER TESTIMONY RE PROCESSING/TESTING OF FRESNO CLUBHOUSE (F.R.E. 401, 402, 403); (2) MOTION TO DETERMINE WHETHER EVIDENCE OF LUMINOL OR OTHER PRESUMPTIVE TESTING SHOULD BE EXCLUDED UNDER F.R.E. 702 AND 403 AND UNDER *DAUBERT/KUMHO TIRE* AND RULE 16; REQUEST FOR JUDICIAL NOTICE [EXHIBITS APPENDED TO DECLARATION]**<br><br>**Date:  February 24, 2021**<br>**Time: 10:00AM**<br>**Dept:  The Honorable Edward M. Chen**<br>       **District Judge** |

# TABLE OF CONTENTS

I. INTRODUCTION ...................................................................1

II. SUMMARY OF PERTINENT FACTS .................................................4

    A. Additional Testing ......................................................5

    B. Argument by Mr. Barry (excerpted) January 13, 2021 .................6

III. DISCUSSION AND AUTHORITIES .................................................7

    A. The Proposed Evidence Is Not Relevant or Admissible .............7

    B. In Order for a Court to Permit Presumptive Testing/Luminol Testing to Be Associated with Blood Evidence, the Court Will Need to Review the Proposed Evidence Under the Filter of Scientific and/or Technical Evidence, Especially Given that the FBI Laboratory Did Not Develop Any Evidence of the Presence of Blood on the Materials Submitted from the Fresno Clubhouse ........................................................9

    C. In a Case in Which the Government Has Provided Reports Indicating That the FBI Lab Could Not Confirm the Presence of Human Blood on Any Evidence Taken from the Fresno Clubhouse, the Court Should Not Allow Any Evidence of Presumptive Test Results; and If it Is Inclined to Do So over Objection, a Hearing Is Clearly Necessary to Determine the Basis for the Admissibility of the Evidence. ................................15

CONCLUSION ..........................................................................18

**MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF WENDT (1) *IN LIMINE* MOTION TO EXCL EVIDENCE TECHNICIAN TESTIMONY RE PROCESSING OF FRESNO CLUBHOUSE; (2) MOTION TO DETERMINE WHETHER EVIDENCE OF LUMINOL TESTING SHOULD BE EXCLUDED UNDER F.R.E. 702 AND 403, *DAUBERT/KUMHO TIRE,* RULE 16; REQUEST FOR JUDICIAL NOTICE**

i

# **TABLE OF AUTHORITIES**

**Cases**

*Brenk v. State*
  311 Ark. 579; 847 S.W.2d 1 (1993) .................................................................14

*Cliff St. Joseph v. Borg*
  1995 U.S.Dist. LEXIS 19425 (N.D.Ca, December 22, 1995), ...........................14

*Daubert v. Merrell Dow Pharm.*
  43 F.3d 1311 (9th Cir., 1995). ........................................................................10

*Daubert v. Merrell Dow Pharmaceuticals*
  509 U.S. 579 (1993)...............................................................................10, 11

*Diviero v. Uniroyal Goodrich Tire Co.*
  114 F.3d 851 (9th Cir., 1997) ...........................................................................11

*Elsayed Mukhtar v. California State University*
  299 F.3d 1053 (9th Cir., 2002) .........................................................................10

*General Electric Co. v. Joiner*
  522 U.S. 136 (1997)..........................................................................................13

*Houston v. State*
  321 Ark. 598; 906 S.W.2d 286 (1995) ............................................................13

*Kulsar v. Soto*
  2017 U.S.Dist. LEXIS 81452 (C.D.Cal, April 25, 2017) ................................14

*Kumho Tire Co. v. Carmichael*
  526 U.S. 137 (1999)..........................................................................................11

*State v. Daniels*
  179 S.W.3d 273 (2005)......................................................................................14

*State v. Fukusaku*
  85 Haw. 462; 946 P.2d 32 (1997) ....................................................................14

*State v. Moody*
  214 Conn. 616; 573 A.2d 716 (1990) ..............................................................13

**MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF WENDT (1) *IN LIMINE* MOTION TO EXCL
EVIDENCE TECHNICIAN TESTIMONY RE PROCESSING OF FRESNO CLUBHOUSE; (2) MOTION
TO DETERMINE WHETHER EVIDENCE OF LUMINOL TESTING SHOULD BE EXCLUDED UNDER
F.R.E. 702 AND 403, *DAUBERT/KUMHO TIRE,* RULE 16; REQUEST FOR JUDICIAL NOTICE**
ii

*Tocker v. Shinn*
220 U.S.Dist. LEXIS 85757 (D.Ariz, May 14, 2020) ...................................................15

*U.S. v. Frazier*
442 F.Supp.3d 1012 (M.D.Tenn, 2020)...........................................................................12

*United States v. Fell*
2015 LEXIS 82548; 2015 WL 3887151 (D.Vt, June 23, 2015 ................................11, 17

## Rules

Federal Rule of Criminal Procedure 16 .............................................................3, 4, 8, 16

Federal Rule of Evidence 401 ............................................................................3, 7, 8, 17

Federal Rule of Evidence 402 ............................................................................3, 7, 8, 17

Federal Rule of Evidence 403 ............................................................................3, 7, 8, 17

Federal Rule of Evidence 702 .................................................................................10, 17

## Other Authorities

Gill, Peter, *Misleading DNA Evidence: Reasons for Miscarriages of Justice*, Elsevier
Science, Kindle edition (6-18-2014)................................................................................10

## I. __INTRODUCTION__

The Government alleges that Joel Silva was killed in July 2014 at the Fresno Clubhouse. The Government tested that Clubhouse in November 2017 for trace evidence including blood evidence for purposes of a comparison with a buccal swab taken from Mr. Silva before his disappearance. No blood evidence was found but, reportedly, the technicians observed positive reaction to unnamed "presumptive blood testing" and to "Luminal testing". Evidence with suspected blood evidence was taken from the Clubhouse and sent to the FBI Laboratory which found *no detectable blood evidence* on any of the items seized and testing. Despite the fact that no blood evidence was found and no DNA evidence will be presented regarding the Clubhouse, the Government seeks to present an array of witnesses to establish that the Clubhouse was processed as a possible murder scene and that testing of various kinds was done at the scene. The Government has not disclosed exactly what screening was done at the scene. This proposes to offer what amounts to irrelevant evidence that if admitted over multiple objections will result in several days of testimony about the many variables that can cause false positive results during a presumptive test—particularly one that (a) was done more than 3 years after the alleged crime and (b) that Laboratory tests could not replicate or verify.

As will be explained in greater detail below, the net product of the search, in terms of evidence sought to be introduced, was the result of some presumptive blood testing and Luminol processing of the Fresno clubhouse which reportedly yielded some positive results. The Government has provided the defense with what purport to be photographs of Luminol reaction obtained during the course of the November 20, 2017 processing of the scene. (Exhibit A – FBI 302.)

When pressed for the Government's reasoning for introducing the evidence (and withdrawing the offer previously made of calling physical scientists to present the evidence, AUSA Barry explained to the Court that the Government would seek to introduce the evidence to avoid being accused of not searching for evidence pertinent to the Joel Silva killing. (The argument Mr. Barry made is quoted below, from the transcript

1    of the January 13, 2021 hearing before this Court.)

2        During the January 13, 2021 hearing, neither party pointed out that in addition to

3    having processed the Fresno clubhouse, swabs from the processing were actually sent to

4    the FBI laboratory, which reviewed the evidence and issued reports about it in September

5    of 2018, December of 2018, and again in May of 2020.  (Exhibit B to this motion.)  The

6    2018 laboratory based analyses by the FBI's DNA unit included the inspection of the

7    evidence tendered from the Fresno clubhouse for blood.  None was found.  At the same

8    time, a buccal sample taken from Mr. Silva was transmitted to the laboratory for DNA

9    reference.  Since no comparative testing could be done (no blood having been confirmed

10   or found on any of the submitted evidence items), no comparison could be made.

11       This motion seeks an order excluding any evidence of presumptive blood testing

12   or Luminol results, and any argument to the effect that blood evidence pertinent to this

13   case was found in the Fresno County clubhouse.  Mr. Silva is alleged to have been killed

14   on July 15, 2014.  The clubhouse was processed on November 20, 2017.  Further

15   confirmatory testing and inspection at the FBI crime lab produced no blood evidence

16   results.  Yet the Government apparently – in addition to tendering evidence that there was

17   processing done at the Fresno clubhouse – wants to intimate to the jury through the

18   results of presumptive testing that screening testing for blood produced evidence of blood

19   in the Fresno clubhouse.  The Court should exclude the evidence and any argument to

20   that effect.

21       As will be demonstrated here, first, there is no scientific or technical basis on

22   which the Government can reliably have an evidence technician link presumptive testing

23   results to the finding of human blood – especially where confirmatory inspection and

24   further processing yields no positive blood results.  Second, the Government has

25   disclosed no information that it intends to rely on from an actual scientist (as opposed to a

26   technician who has had some training in evidence processing) to the effect that

27   presumptive blood testing done several years after the fact necessarily identifies case-

28   specific human blood evidence (or human blood at all) in this case.  (See Exhibit C and

1  D, forensic science articles discussing presumptive blood testing, including Luminol.)

2  The evidence proposed to be introduced in this case should be excluded.  There has been

3  extensive litigation on the attempts to admit presumptive testing for blood in a variety of

4  contexts, and the defense demonstrates here that there is ample reason to exclude such

5  evidence, especially where confirmatory testing identifies no blood evidence.

6        The Government belatedly decided that it would propose the testimony of

7  Forensic Examiner Amanda Bakker to provide information about how the FBI does

8  serological testing, and the various ways that presumptive and confirmatory testing is

9  done in the laboratory setting.  The evidence proposed is irrelevant, especially if it is

10 being used as a backdoor way to try to demonstrate that notwithstanding negative results

11 on blood evidence tendered to the lab that allegedly came from the Fresno clubhouse, it

12 would be both relevant and admissible for the Government to seek to have a lab examiner

13 provide the jury speculative information about the performance of presumptive tests in

14 the field.  There are manuals, circulars, and a number of transcripts of evidence of FBI

15 serologists and blood evidence examiners about the evaluation of blood-related testing at

16 the FBI's lab.  Were the Court to overrule the objection that Ms. Bakker has no evidence

17 of value to present to the jury that is relevant or admissible (F.R.E. 401, 402, and 403),

18 nonetheless, the Government would need to disclose what Ms. Bakker's opinions are and

19 what the bases for them is.  There is no information that has been disclosed about Ms.

20 Bakker's opinions about the forensic science associated with presumptive and

21 confirmatory blood testing, or with the Government's/FBI's procedures for the use of

22 various serological tests in a laboratory setting.  These violations of F.R.C.P. 16(a)(1)(F)

23 and (G) should further cause the Court to exclude the testimony of Ms. Bakker.

24       Finally, while the defense understands that it may well be legitimate for the

25 Government to introduce evidence that there was a search and attempt to find evidence of

26 a shooting and killing in the Fresno County clubhouse, the Government should not be

27 allowed to introduce evidence that is not even demonstrably marginally relevant and that

28 clearly presents a substantial danger of misleading the jury, confusing the issues, and of

unfair prejudice. Taking the time to fully explain the results of the analyses and the vicissitudes of presumptive testing for human blood would cause a waste of time – all reasons to exclude the evidence under F.R.E. 403.

In order to demonstrate that this exclusion is warranted, the defense also argues that if the Court were inclined to admit the evidence, then it should only do so after it has heard evidence from qualified forensic scientist's discussion presumptive blood testing on the one hand, and the various issues that arise from using Luminol in processing a scene for blood on the other, and in concluding that blood is a definitive finding. (See scientific literature on Luminol and presumptive blood testing in Exhibits B and C.) In this connection, the defense points out that the Government has <u>never</u> revealed what presumptive blood tests were used in the Fresno clubhouse – it is well aware it would need to provide such information to the defense in order to satisfy the dictates of F.R.C.P. 16(a)(1)(F) and (G).

## II.    SUMMARY OF PERTINENT FACTS

Having raised the issue of the Government's withdrawal of an offer of testimony from two FBI 'physical scientists' in a letter dated January 12, 2021 (that was brought to the attention of this Court by undersigned counsel for Mr. Wendt during arguments on January 13, 2021), the Government explained that instead of calling physical scientists from the FBI, the Government disclosed the following:

> Instead, we expect to call FBI evidence recovery technicians who conducted the search of the Fresno clubhouse. They will not be offering expert opinions. Instead they will testify about what they saw and the actions they took, consistent with the information provided in their reports (attached).[1]

The report that the Government made reference to in the just-quoted letter is a four-page report offered by FBI agents on November 22, 2017, chronicling an

---

[1] From page 3 of the Government's January 12, 2021 letter to counsel responding to a letter written by undersigned Philipsborn on December 31, 2020.

investigation reported on November 20, 2017, "Search Warrant Conducted at 2273 South G Street, Fresno, California 93721." (Exhibit A – FBI 302). The search, according to page 1 of the report, was conducted at the "Hells Angels Fresno Clubhouse…." While in the location, according to the report (at page 3):

> Presumptive blood testing was conducted in several locations by SA Newberry (SF ERT) and SA Varrasso (see attached Blood Collection Log). Three areas tested resulted in positive results.
>
> [DNA collection paragraph not quoted]
>
> Luminol was applied to the floor area near the stage and on the wall in area "G" left side of stage, the wall by the table located in area "H", the wall above the sink area "I" to search for latent blood stains. These areas reacted positively with the Luminol. Photographs were taken by SOS Heideman of the reaction.[2]

On January 26, 2021, the Government provided yet another disclosure titled: "Supplemental Notice of Expert Opinions." (Exhibit B.) In that notice at page 3, the Government added to its description, explaining that members of the team who processed the Fresno clubhouse on November 20, 2017, would provide information, including:

> They will describe their analysis and plan of how to process the scene based on their observations of the location and their training and experience. **They will describe and explain the tools that were used to process the scene**, which included presumptive blood testing and **Luminol testing**. They will explain, ***based on their training and experience***, what they did to perform the tests that day and what they observed regarding the test results. They will also explain, based on their training and experience, *their understanding of what the presumptive test results they observed means*, their subsequent actions in response and how to preserve evidence to send to a laboratory for additional testing. [Emphasis supplied.]

## A.    Additional Testing

According to disclosures provided to the defense by the Government, evidence from the Fresno clubhouse was submitted for laboratory examination to the FBI

---

[2] From the report of the search of November 20, 2017, at pages 3-4.

1  Laboratory where it was reviewed by a Forensic Examiner named Amanda Bakker.
2  (Exhibit B.)  Ms. Bakker is identified in her CV as a forensic examiner since March of
3  2015, and prior to that, a biologist in the Nuclear DNA Unit since January of 2009.

4  According to a report from Ms. Bakker dated September 27, 2018, she received a
5  series of items from the location at 2273 South G Street – the address of the Fresno
6  clubhouse.  A total of 26 items were submitted.  Some of these were swabs.  Some were
7  actual items, including several hammers found in the clubhouse.  There was also an axe
8  and three knives.  The swabs, six hammers, three knives, and one axe were all processed
9  and examined for the presence of blood.  A reagent was used for the testing. No blood
10 was detected.  Similarly, 16 swabs from various parts of the clubhouse were examined.
11 No blood was found. [3]

12 A second report, dated December 13, 2018, reports on examination of three
13 additional evidence items from the Fresno Clubhouse, including two physical items (a
14 piece of a rail from a stage; a piece of wood from a stage) and a lining from a coffin.  No
15 blood was detected.  The conclusions were arrived at through the same methodology
16 reported with the first examination.[4]

17 Finally, on May 19, 2020, Ms. Bakker issued a report indicating that a buccal
18 sample from Joel Silva was processed through DNA analysis, and the profile was
19 retained.  This report too was generated by Amanda Bakker.  (See Exhibit B.)  The
20 Government disclosed Ms. Bakker's work but has not indicated a specific intent to call
21 her as a witness.

22 **B.    Argument by Mr. Barry (excerpted) January 13, 2021**

23 On January 13, 2021, in his argument, Mr. Barry explained the reason for

---

25 [3] The report reads in pertinent part, "This conclusion is based on the result of the phenolphthalein test.
26 Insufficient quality and/or quantity of biological material may affect the ability to detect blood."

27 [4] A separate submission was made to the laboratory dealing with presumptive testing and processing, at the
laboratory, of a series of items from the Sonoma clubhouse, which resulted in a report dated March 28, 2019.  These
28 items appear to relate to an incident alleged to have occurred in the Fresno clubhouse, and are not related to the
Fresno investigation.

introducing the evidence as follows:

> And, in fact, in some ways, you know, looking down the road, I can
> see that there – they won't be giving expert testimony, but I
> anticipate that they are going to try to exclude this testimony because
> it borders on expertise for them.

> But then the argument is going to be that the Government didn't do
> enough. You know, we're always faced, you know, especially when
> there is negative evidence, we're faced with the issue of defense
> arguing, you know, that the Government performed a sloppy
> investigation. "You don't see this evidence because the Government
> didn't do these things." And so, we need to be able to present the
> jury, the steps that were taken.[5]

## III. DISCUSSION AND AUTHORITIES

### A. The Proposed Evidence Is Not Relevant or Admissible

Pursuant to the discussion that the defense had with the Court on January 13, 2021, the Wendt defense is objecting that the presumptive blood testing and Luminol test information proffered is neither relevant under F.R.E. 401 and 402 nor admissible under F.R.E. 403. Briefly stated, the Government proposes to introduce evidence of purported areas of blood evidence in a clubhouse that was in consistent use over the years between the summer of 2014 and November 2017. There is no indication that the Government intends on treating the processing of the scene or the alleged results of presumptive blood testing as scientific or technical evidence.

The Government acquired a series of evidence items from the Fresno clubhouse that it submitted to the FBI lab. (Exhibit B.) As explained above, the Government then provided the defense reports indicating that after evidence from the clubhouse was processed using chemical reagents in a laboratory setting, no blood evidence was detected. (Exhibit B.) In sum, as the defense understands the Government's proffer, it intends on introducing unnamed and undescribed presumptive tests done by evidence

---

[5] Reporter's Transcript of the argument on motions on January 13, 2021, at RT 52.

**MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF WENDT (1) *IN LIMINE* MOTION TO EXCL EVIDENCE TECHNICIAN TESTIMONY RE PROCESSING OF FRESNO CLUBHOUSE; (2) MOTION TO DETERMINE WHETHER EVIDENCE OF LUMINOL TESTING SHOULD BE EXCLUDED UNDER F.R.E. 702 AND 403, *DAUBERT/KUMHO TIRE,* RULE 16; REQUEST FOR JUDICIAL NOTICE**

technicians for the presence of blood, the details of which are unexplained, as well as the results of some Luminol processing of the Fresno clubhouse more than three years after an individual was allegedly killed in that clubhouse and proposes that this is relevant and admissible evidence in this case. At the same time, it is calling a Forensic Examiner from the FBI Crime Lab to testify about testing that yielded no positive results, but also to testify in an undisclosed way about presumptive and confirmatory blood tests – not about the variables that affect presumptive tests applied years after the fact.

In addition, the Government disclosed its intent, as of January 26, 2021, to use Forensic Examiner Amanda Bakker who is at the FBI's laboratory to testify about presumptive and confirmatory testing for blood evidence and other bodily fluid evidence as explained beginning at the bottom of page 1 of the January 26, 2021 letter from the Government to defense counsel.[6] Ms. Bakker's proposed evidence should not be permitted for two different reasons. First, the Government has utterly failed to transmit both her opinions as well as the bases for her opinions about the operation of serological testing, presumptive and confirmatory testing in general terms, and what can and should be expected from such testing – both according to the FBI's protocols and procedures, and according to whatever her knowledge of the pertinent science is. This is yet another example of the Government's failure to comply with F.R.C.P. 16(a)(1)(F) and (G). In addition, the Court should not permit the Government essentially to intimate to the jury that Ms. Bakker can in some ways 'retrofit' or explain what an evidence technician claimed to have been a 'positive' result for blood evidence at a crime scene that Ms. Bakker did not inspect and did not process. Her evidence on this would be irrelevant under F.R.E. 401 and 402, and inadmissible under 403. Finally, were the Court inclined to allow her explanatory testimony about presumptive and confirmatory testing for blood evidence, in addition to getting disclosure of the opinions, the Court would need to

---

[6] Page 1 of the letter as it exists in unredacted form is the address page to all defense counsel. For the sake of preserving privacy, that cover page is excised, otherwise the full text of the letter is available to the Court.

determine whether her opinions about scientific evidence are in fact admissible under *Daubert/Kumho Tire*.

The evidence is neither relevant nor admissible. Moreover, as explained in further detail below, there has been extensive litigation in both State and Federal courts about the admissibility of opinions and evidence related to the use of presumptive blood testing, both in the field and in laboratory settings. Particularly where <u>no confirmatory test results</u> exist, and where the Government would be hard-pressed to have a qualified expert tell a jury that presumptive blood testing is a definitive technique and methodology for identifying human blood, the Government's proposed evidence simply cannot and should not be admitted.

Tellingly, the Government is using a gambit here. Having initially tendered notice of its intention to call physical scientists to testify about the processing of the evidence, and also having the opportunity to call a forensic scientist from the FBI laboratory who actually analyzed the evidence in this case, the Government is doing neither. It is proposing to call some evidence technicians to testify about what they did and to testify that they obtained what they will say is positive reaction indicating blood evidence in the scene of the Fresno chapter of the Hells Angels clubhouse. The Government's proposal is that the evidence it seeks to present – since it is intentionally not calling individuals who are labeled as scientists – is not scientific evidence, but simply the evidence of a person who ministerially does things in a crime scene and impounds evidence. The proposal cannot be viewed as a serious endeavor in a case in which the Government's purpose is to convict Mr. Wendt and co-defendants, and to further seek life sentences for all concerned.

As is demonstrated here, the courts that have been hosts to serious presentations of the results of presumptive blood testing have taken various positions – none of them fully endorsing the view that a court should offer no gateway analysis to a proffer like the one being made here.

**B.     In Order for a Court to Permit Presumptive Testing/Luminol Testing**

**to Be Associated with Blood Evidence, the Court Will Need to Review the Proposed Evidence Under the Filter of Scientific and/or Technical Evidence, Especially Given that the FBI Laboratory Did Not Develop Any Evidence of the Presence of Blood on the Materials Submitted from the Fresno Clubhouse**

The Government's gambit, were the Court to actually take it seriously enough to consider it, is going to lead to the introduction into this case of what has been labeled the 'association fallacy' in regard to biological evidence. An acknowledged expert in the field explained the issue as follows when he explained that drawing inferences from a presumptive test is fraught with danger:

> The 'association fallacy' is introduced to describe the 'automatic' and absolute assumption that a DNA profile has come from a body fluid on the strength of presumptive or RNA tests, verified by 'expert opinion.' However, the observation of a body fluid and the detection of a DNA profile are two separate tests. It cannot be implied with certainty that the body fluid and the DNA have the same source.[7]

True, in this case, we have not gotten to a point at which an analyst is trying to claim that a DNA profile could be linked to presumptive testing of what appeared to be a human body fluid. But what we do have here is a claim that a technician at the scene developed a bloodstain based on presumptive processing of a possible crime scene three years after the fact – and after the alleged proper use of presumptive testing for the presence of blood.

While the Government is uninterested in having this Court deal with the situation as one that requires the Court to address this evidence as expert testimony, subject to F.R.E. 702, the Government is wrong. This is "…scientific, technical, or other specialized knowledge…" F.R.E. 702. This evidence is admissible only if it is "…both relevant and reliable." *Elsayed Mukhtar v. California State University*, 299 F.3d 1053,

---

[7] Peter Gill, *Misleading DNA Evidence: Reasons for Miscarriages of Justice*, Elsevier Science, Kindle edition (6-18-2014).

1   1063 (9th Cir., 2002), *citing Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579,

2   589 (1993). The Government has the burden here. "The party presenting the expert must

3   show the expert's findings are based on sound science, and this will require some

4   objective, independent validation of the expert's methodology." *Daubert v. Merrell Dow*

5   *Pharm.*, 43 F.3d 1311, 1316 (9th Cir., 1995).

6       "Rule 702 demands that expert testimony relate to scientific, technical, or other

7   specialized knowledge, which does not include unsubstantiated speculation and

8   subjective beliefs." *Diviero v. Uniroyal Goodrich Tire Co.*, 114 F.3d 851, 853 (9th Cir.,

9   1997) [citing *Daubert, supra*, 509 at 590].

10      The Court is well aware of the *Daubert* factors, including: (1) whether the theory

11  or technique can be or has been tested; (2) whether the theory or technique has been

12  subjected to peer review and publication; (3) the known or potential error rate and the

13  existence of maintenance standards controlling the technique's operation; and (4) whether

14  the technique is generally accepted. *Daubert*, 509 U.S. at 593-94. See also *Kumho Tire*

15  *Co. v. Carmichael*, 526 U.S. 137, 151 (1999).

16      This is not the first time that lawyers from the Northern District of California have

17  been involved in litigation over the admissibility of the results of presumptive testing—

18  which occurred during *Daubert* hearings. Undersigned counsel for Mr. Wendt was

19  involved in the litigation of an authorized capital case which produced a ruling on the

20  admissibility of evidence developed through a phenolphthalein test – the test used by the

21  FBI Lab as the blood screening test in this case in the FBI laboratory. (Exhibit B.)

22  *United States v. Fell*, 2015 LEXIS 82548; 2015 WL 3887151 (D.Vt, June 23, 2015).[8]

23  There, the court held a *Daubert* hearing and heard evidence presented by experts on both

24  sides, including an FBI Forensic Examiner who discussed the evolution of blood testing

25  in the FBI Lab. Chief Judge Crawford, who heard the challenge, explained in his

26  unpublished order that phenolphthalein is a presumptive test, not conclusive – in part

27  ───────────────────

28      [8] Another Northern District based lawyer, Michael Burt, addressed the blood testing issues in *Fell*.

because substances other than blood will react with the test. The Government agreed that the test only demonstrates that the stain may be human blood. 2017 U.S.Dist. LEXIS at *8-9. Nonetheless, because the presumptive testing led to DNA testing that developed profiles, the *Fell* court permitted the evidence of the presumptive test to go forward.

In his ruling, Judge Crawford distinguished the ruling entered by the District of New Mexico in *U.S. v. McCluskey*, which *precluded* evidence of phenolphthalein testing in the absence of confirmatory tests, in part because the Government had made "absolutely no effort to demonstrate the reliability and relevance of phenolphthalein testing or to demonstrate its admissibility under *Daubert*." *McCluskey*, Case No. 10-CR-2734-JCH, at page 6 (D.NM, February 26, 2013), ECF 827.[9] Of some note is the *Fell* court's observation that:

> The Government further asserts that *McCluskey* is distinguishable because in that case there was no strongly corroborating evidence of blood, and because the Government had not sufficiently demonstrated the reliability of phenolphthalein to the court.[10]

The *Fell* court also noted that DNA testing was used to confirm the presence of identifiable human blood yielding DNA profiles. No such evidence was developed here.

Indeed, there have been a number of litigations in which efforts were made to preclude the introduction of the results of chemical reagent testing to identify latent blood stains. For example, in *U.S. v. Frazier*, 442 F.Supp.3d 1012 (M.D.Tenn, 2020), the defense called the developer of a Luminol-like product used as a presumptive blood test. *Id.*, at 1026-27. (See Exhibit D discussing Luminol and Bluestar.) The argument offered to the court was that among other things false positives can be introduced, including cleansers and a number of other substances to include animal blood, vegetable matter, and other products and substances. *Ibid.* The literature supports the concerns. (Exhibits

---

[9] Referenced in *Fell*, at 2017 U.S.Dist. LEXIS 227656, *9. Attorney Michael Burt was counsel in *McCluskey*.

[10] *Fell*, at *12-13.

C and D.)

Of some consequence to the issues presented here was that in the *Frazier* case, according to the court's published ruling:

> Here, the need for [the defense expert's testimony] is not self-evident because the Government concedes that Luminol (and Bluestar for that matter) 'do not conclusively identify blood, but they aid investigators by identifying areas to swab or collect for further testing to determine if blood is present.' [Citation to record.][11]

In this case, of course, the Government is not interested in having an expert testify about the vagaries of using chemical reagent tests to try to presumptively identify possible blood evidence. But having a technician opine that a chemical reagent caused a reaction with blood runs into what the U.S. Supreme Court explained was a problem in the ruling in *General Electric Co. v. Joiner*, 522 U.S. 136 (1997), which explained that conclusions and methodology are not entirely distinct from one another, and confirming that "…nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data by the *ipse dixit* of the expert." *Id.*, at 146.

In *State v. Moody*, 214 Conn. 616, 573 A.2d 716 (1990), the Connecticut Supreme Court reversed a murder conviction because it concluded that the trial court had abused its discretion when it admitted into evidence the result of a 'presumptive test for blood' performed on a stain located on the accused's shoe. The expert had apparently testified in that case that while the stain was a positive result, it could be human blood, animal blood, or something other than blood. *Id.*, at 722-23. The Connecticut Supreme Court, however, concluded: "In the present case, the result of the 'presumptive test for blood' had no probative value whatsoever. The test result did nothing toward establishing the likelihood of the presence of human blood on the sole of the defendant's shoe." *Id.*, at

---

[11] *Frazier*, at 1026-28. The court deferred ruling on whether the defense would be permitted to call the expert.

723-24.

Similarly, in *Houston v. State*, 321 Ark. 598, 600; 906 S.W.2d 286 (1995), the Arkansas Supreme Court held that: [b]ecause Luminol testing can return false positive results by reacting with substances other than human blood, and because Luminol testing is not time-specific, Luminol test results are not relevant per se and their admission without additional factors that relate that evidence to the crime would confuse a jury." In another case, the same court had concluded that because Luminol tests "…which are presumptive only, had no probative value and did nothing to establish the likelihood of the presence of [an individual's] blood, or even human blood…," the lack of follow up testing established that the Luminol test had no probative value. *Brenk v. State*, 311 Ark. 579, 594; 847 S.W.2d 1 (1993).

The Hawaii Supreme Court arrived at a similar conclusion when it upheld a trial court's rejection of the introduction of Luminol and phenolphthalein testing without confirmatory blood tests in *State v. Fukusaku*, 85 Haw. 462, 496-97; 946 P.2d 32 (1997).

Various unpublished cases from the districts in California reviewing State court testimony about Luminol testing also discuss the uncertainties involved in that process. For example, Judge Lynch, when he sat in the Northern District, considered the allegations made in post-conviction litigation in *Cliff St. Joseph v. Borg*, 1995 U.S.Dist. LEXIS 19425 (N.D.Ca, December 22, 1995), where the underlying evidence, developed during a criminal case investigation conducted in the Northern District of California (in a State case) included evidence that Luminol testing had been done. In his ruling, Judge Lynch noted that the State court had received evidence that Luminol does not distinguish "animal from human blood and will react to metals, peroxidase, and strong oxidizing agents." *Id.*, at *8-9. In another California-based Federal District Court review of a State conviction, the Central District of California summarized a record that included testimony about various blood tests, where there was also evidence that Luminol "…can give false positives." *Kulsar v. Soto*, 2017 U.S.Dist. LEXIS 81452 (C.D.Cal, April 25, 2017) at *26-27. The criminalist who testified was said to have testified that "…it is

possible to get a positive under a Luminol test if someone simply washes clothes and is in certain types of detergent or uses a product such as Shout." *Id.*, at *26-27.

The Court of Appeals for the Western District of Missouri decided in *State v. Daniels*, 179 S.W.3d 273 (2005), that: "The evidence of the positive Luminol tests absent confirmatory scientific testing without satisfying *Frye* that a positive Luminol test, without scientific corroboration, proves the existence of blood prejudiced Mr. Daniels' right to a fair trial." *Id.*, at 285-86.

A Federal District Court in Arizona considered a claim of ineffectiveness built in part around the argument that defense counsel was ineffective for not challenging the admissibility of the State's Luminol testing, based in part on the contention that defense counsel had not sufficiently examined or challenged the State's expert about false positives. In its ruling, the District Court noted that the State's Luminol expert explained that things like "'slate, copper, or rust will create false positives. She also indicates that bleach may create a false positive.'" *Tocker v. Shinn*, 220 U.S.Dist. LEXIS 85757 (D.Ariz, May 14, 2020), at *49-50, referencing statements from the trial court about the evidence during trial, with the further observation (in the quoted record) that the defense lawyer had questioned the State's Luminol expert about false positives. *Id.*, at *49-50.

C. **In a Case in Which the Government Has Provided Reports Indicating That the FBI Lab Could Not Confirm the Presence of Human Blood on Any Evidence Taken from the Fresno Clubhouse, the Court Should Not Allow Any Evidence of Presumptive Test Results; and If it Is Inclined to Do So over Objection, a Hearing Is Clearly Necessary to Determine the Basis for the Admissibility of the Evidence.**

Having been pushed to explain its actual plan in this case, the Government retreated from offering to call laboratory personnel to testify about the implications of presumptive blood testing in the Fresno clubhouse.[12]

---

[12] In part because in the face of several defense requests for clarification of its intentions, the Government has failed to describe what "presumptive blood testing" other than Luminol was undertaken, the government should be precluded from introducing any evidence developed from so-called "presumptive blood testing." The Government passed on its opportunity to explain itself when on January 26, 2021 (see attached exhibit), it proffered: "They [the analysts] will explain, based on their training and experience, what they did to perform the tests that day

MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF WENDT (1) *IN LIMINE* MOTION TO EXCL EVIDENCE TECHNICIAN TESTIMONY RE PROCESSING OF FRESNO CLUBHOUSE; (2) MOTION TO DETERMINE WHETHER EVIDENCE OF LUMINOL TESTING SHOULD BE EXCLUDED UNDER F.R.E. 702 AND 403, *DAUBERT/KUMHO TIRE,* RULE 16; REQUEST FOR JUDICIAL NOTICE

15

On January 13, 2021, in his argument, Mr. Barry explained the reason for introducing the evidence as follows:

> And, in fact, in some ways, you know, looking down the road, I can see that there – they won't be giving expert testimony, but I anticipate that they are going to try to exclude this testimony because it borders on expertise for them.

> But then the argument is going to be that the Government didn't do enough. You know, we're always faced, you know, especially when there is negative evidence, we're faced with the issue of defense arguing, you know, that the Government performed a sloppy investigation. "You don't see this evidence because the Government didn't do these things." And so, we need to be able to present the jury, the steps that were taken.[13]

As far as the Wendt defense is concerned, the Government can, assuming the validity of its warrant and the basis for any search, introduce evidence that a search occurred and describe some of the activities undertaken, and the evidence that was taken from the clubhouse. But to permit the Government to present testimony from evidence technicians that they performed unnamed tests for the presence of blood, obtained positive results, and then got reactions on Luminol testing is to permit misdirection of a jaw dropping sort – especially since the Government is well aware that the FBI laboratory was unable to find corroboration for the presence of blood. This is something that Mr. Barry admitted in passing: "We're not going to be able to say that the biological evidence came back positive to support, you know, people's versions of what happened because, you know, because the time passed." *Id.*, at 52:22-25.

In addition, the Government has proposed to call a forensic examiner essentially to testify about a series of negatives – meaning that her laboratory in Quantico found no

_____

and what they observed regarding the test results." (Appended exhibit at page 3.) This sad effort to pretend that there was no need for scientific or technical evidence and that avoiding naming the tests is a viable way of providing disclosures is regrettable. The Government should not get credit for its omission.

[13] Reporter's Transcript of the argument on motions on January 13, 2021, at RT 52.

**MEMO OF POINTS AND AUTHORITIES IN SUPPORT OF WENDT (1) *IN LIMINE* MOTION TO EXCL EVIDENCE TECHNICIAN TESTIMONY RE PROCESSING OF FRESNO CLUBHOUSE; (2) MOTION TO DETERMINE WHETHER EVIDENCE OF LUMINOL TESTING SHOULD BE EXCLUDED UNDER F.R.E. 702 AND 403, *DAUBERT/KUMHO TIRE,* RULE 16; REQUEST FOR JUDICIAL NOTICE**

1  blood evidence on any item submitted from the Fresno clubhouse and then found no

2  DNA suitable for comparison on a sample of evidence submitted and allegedly belonging

3  to Victim 1 – Joel Silva, the alleged victim of the July 15, 2014 homicide.  First, as

4  argued throughout, the proposed evidence from Ms. Bakker is not relevant.  Second, a

5  fair amount of it, especially her various opinions about why blood evidence may or may

6  not be detectible in serological or DNA testing, remain to be disclosed.  They are

7  tantalizingly suggested as topics for testimony.  But that is not compliance with F.R.C.P.

8  16(a)(1)(F) and (G).  As explained above, there are cases in which FBI laboratory

9  personnel have appeared to describe the serological and DNA testing processes, and the

10  evidence involves opinions; lab manuals; lab procedures; a description of the scientific

11  basis for the opinion testimony.  In other words, compliance with Rule 16.

12  More than that, however, the Wendt defense is concerned that Ms. Bakker's

13  proposed evidence is being suggested as a backhanded way of trying to explain – without

14  disclosure of the basis for the opinion in advance – why evidence technicians at a crime

15  scene might get positive results on some presumptive tests and Luminol luminescence

16  testing, while evidence taken from the same scene ends up showing no detectible blood in

17  a laboratory setting.  One obvious trial tactic behind this theatrical proffer is a

18  backhanded way of trying to suggest that while the FBI lab found nothing, that may not

19  mean that there is nothing to find in the Fresno clubhouse.  Second, as demonstrated by

20  the discussion from Chief Judge Crawford in the above-cited *Fell, supra*, ruling, the kind

21  of hearing that is necessary to determine the reliability of the discussion of the applied

22  methodologies is a lengthy process, in part because it entails a description of changed

23  FBI presumptive testing protocols over the years; a discussion of the scientific literature

24  that describes an array of experiments with presumptive blood testing under various

25  conditions.  There is every reason to exclude such evidence for the reasons demonstrated

26  in Exhibits C and D appended to defense counsel's declaration.

27  Under the circumstances, this evidence clearly cannot be admitted under the rules

28  requiring relevance (F.R.E. 401 and 402), the rules applicable to the assessment of the

admissibility of opinion evidence, including F.R.E. 702, and especially under F.R.E. 403.

## CONCLUSION

For all of the reasons stated, this Court should exclude the evidence. If it is inclined to admit it, there will be the need for a hearing at which qualified forensic scientists will need to testify.

Dated: February 3, 2021                    Respectfully Submitted,

                                           JOHN T. PHILIPSBORN
                                           MARTIN ANTONIO SABELLI


                                            */s/ John T. Philipsborn*
                                           JOHN T. PHILIPSBORN
                                           Attorneys for Brian Wayne Wendt

# PROOF OF SERVICE

I, Melissa Stern, declare:

That I am over the age of 18, employed in the County of San Francisco, California, and not a party to the within action; my business address is Suite 350, 507 Polk Street, San Francisco, California 94102.

On February 3, 2021, I served the within document entitled:

**WENDT DEFENSE (1) *IN LIMINE* MOTION TO EXCLUDE EVIDENCE TECHNICIAN OR FORENSIC EXAMINER TESTIMONY RE PROCESSING/TESTING OF FRESNO CLUBHOUSE (F.R.E. 401, 402, 403); (2) MOTION TO DETERMINE WHETHER EVIDENCE OF LUMINOL OR OTHER PRESUMPTIVE TESTING SHOULD BE EXCLUDED UNDER F.R.E. 702 AND 403 AND UNDER *DAUBERT/KUMHO TIRE* AND RULE 16; REQUEST FOR JUDICIAL NOTICE [EXHIBITS APPENDED TO DECLARATION]**

( )    By placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the United States Mail at San Francisco, CA, addressed as set forth below;

(X)    By electronically transmitting a true copy thereof through the Court's ECF system;

( )    By having a messenger personally deliver a true copy thereof to the person and/or office of the person at the address set forth below.


AUSA Kevin Barry
AUSA Ajay Krishnamurthy
AUSA Lina Peng

All defense counsel through ECF

Executed this 3rd day of February, 2021, at San Francisco, California.

Signed:    */s/ Melissa Stern*
                Melissa Stern