ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

KEVIN J. BARRY (CABN 229748)
AJAY KRISHNAMURTHY (CABN 305533)
Assistant United States Attorneys

450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495
Telephone: (415) 436-6840
FAX: (415) 436-7234
Email; kevin.barry@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 17-CR-0533 EMC |
| Plaintiff, | **UNITED STATES' SENTENCING MEMORANDUM** |
| v. | Hearing Date: June 13, 2024 |
| BRIAN WENDT, et al., | Hearing Time: 9:15 am |
| Defendants. | Hon. Edward M. Chen |

## INTRODUCTION

Defendant Brian Wendt stands before the Court to be sentenced following his conviction at trial for charges of Racketeering Conspiracy (Count One); Conspiracy to Commit Murder in Aid of Racketeering (Count Two); and Murder in Aid of Racketeering (Count Three). Count Three, the VICAR murder conviction, carries a mandatory term of life imprisonment; Count One, RICO conspiracy, carries a maximum term of life; and Count Two, conspiracy to commit VICAR murder, carries a maximum term of 10 years' imprisonment.

Wendt has a lengthy history of Hells Angels-related violence; he was closely associated with the Sonoma County charter of the Hells Angels (HASC); he encouraged and facilitated violent HASC

conduct; and he is the person who killed HASC member Joel Silva for violating Hells Angels rules. Because of the nature of the crimes, and consistent with the recommendation of United States Probation, in addition to the mandatory life term for Count Three, the Court should sentence Defendant Wendt to the statutory maximum terms for the other counts of conviction: life for Count One, and a concurrent 120-month term for Count Two.

## DEFENDANT'S OFFENSE CONDUCT

The Hells Angels are a transnational outlaw motorcycle gang, and the Hells Angels Sonoma County chapter (HASC) is a subset of that organization whose members primarily operate in Sonoma County and the surrounding area. As the evidence at trial established, HASC engaged in a host of criminal activities, and its members engaged in a conspiracy to conduct its affairs as a criminal enterprise. The objectives of the conspiracy included to preserve and protect the power, territory, reputation, and profits of HASC through the use of intimidation, violence, threats of violence, and assaults; promoting and enhancing HASC and the activities of its members and associates; and keeping victims, potential victims, and community members in fear of HASC and its members and associates through violence and threats of violence.

As the Sergeant-at-Arms of all Hells Angels on the West Coast, and as a close associate of HASC during the time at issue in this case, Wendt was a driver of some of HASC's criminal conduct. He was aware of what HASC did; he set an example of violent conduct; and he directly participated in the most serious act of violence in this case, the murder of Joel Silva.

## SENTENCING GUIDELINES CALCULATION

The government accepts the calculation of the Sentencing Guidelines for Defendant's offense conduct in the Presentence Report. That calculation is as follows:

GROUP ONE: Racketeering Conspiracy (Count 1); Conspiracy to Commit Murder in Aid of Racketeering (Count 2); Murder in Aid of Racketeering (Count Three)

1. <u>Racketeering Act 2: VICAR Murder of Joel Silva and Conspiracy to Murder Silva</u>
    a. Base offense level:  43
       (USSG §§ 2E1.3(a)(2) and 2A1.1(a))
    b. Total offense level:  **43**

The Presentence Report correctly calculated that Defendant has a three criminal history points, establishing his CHC level as II.  At an adjusted offense level of 43 (which is the maximum under the Guidelines) and a CHC II, the Guidelines range is life.

### SECTION 3553(A) FACTORS

The factors listed under 18 U.S.C. § 3553(a) direct the Court to impose a sentence that is sufficient, but not greater than necessary, to achieve the goals of sentencing.  *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008).  The key factors in this case are the nature and circumstances of the offense, 3553(a)(1); the need to reflect the seriousness of the crime, to promote respect for the law, and to provide just punishment for the offense, 3553(a)(2)(A); and the need for deterrence, 3553(a)(2)(B). These factors require a Guidelines sentence of life for Counts One and Three and a concurrent terms of 120 months for Count Two.

### The Nature of HASC

As both trials in this case demonstrated, HASC has been a scourge on the community.  The Hells Angels are a group that enforces its rules and its territory through violence, and it venerates and celebrates those who commit violence on its behalf, such as through the "Filthy Few" patch.  In particular, Defendant Wendt is proud of his status among the Filthy Few, as he bears tattoos with this designation, including the numbers 666 ("FFF, or Filthy Few Forever") and the SS lightning bolts.




The Court heard and saw a number of examples of how HASC and its members and associates used violence to project its influence and to demand respect. HASC has contempt for the law and the police, as seen in its historical documents; its interactions with law enforcement officers; its membership rules; and its acts of witness intimidation and obstruction of justice. Indeed, the concept of "no snitching" is literally central to its ethos, as this edict is represented by the stitched-shut mouth on the death head patch that is in the middle of every Hells Angels cut.

The evidence in this case firmly established that violence was the lifeblood of the enterprise. Everyone associated with HASC knew that violent clashes with rivals were an ever-present possibility, a reality brought home most powerfully by the murder of San Francisco Hells Angels president and HASC associate Mark Guardado in 2008. This was seen in by the enterprise's reaction to this event, by the presence of firearms carried by HASC members, by guns in the HASC clubhouse, and by the fortification of the HASC clubhouse over time. As former HASC officer Troy Conte bluntly stated in the Group Two trial, a member who was not willing to kill for the patch would be kicked out of the enterprise.

Violence was not reserved only for rivals, however. Hells Angels who violated enterprise rules were subject to brutal reprisals, as shown by the planned attack on Sacramento member Joey Fats, by the savage beating of Troy Conte, and, of course, by the murder of Joel Silva. Members of HASC puppet clubs were beaten for violation of HASC rules, and members of the public were attacked for even the most trivial displays of perceived disrespect. This was demonstrated by the existence and use of "crime scene cleanup kits," the discovery of knives within the clubhouse that had been "washed with bleach," and the many instances of assault.

A member of the public could be struck unconscious for knocking a Hells Angels vest off a barstool. Chatting up a member's old lady or girlfriend at a bar or a concert was provocation enough for an attack. In fact, Troy Conte recounted knocking out a member of the public as a favor to the victim, because after this person disrespected Raymond Foakes, Conte believed the person would be beaten even more severely if he had not intervened. Bumping into a Hells Angel at a bar and refusing to back down led to a group attack, where the victim was stomped on the ground and his head kicked like a

soccer ball. Failing to yield to Hells Angels on the freeway resulted in being run off the road, and passing a Hells Angels pack resulted in a beating in front of families with children.

The pervasive nature of HASC violence is what made its efforts at extortion and witness intimidation so successful. HASC members could act with impunity because they knew that their threats to victims and other witnesses to keep quiet about what happened to them would be effective. And they were. But for the sexual assault of M.C., Troy Conte would likely have simply accepted his savage beating and simply gone on with his life as a "bad out"—assuming Foakes didn't take further action against him once he was a civilian. Similarly, none of the following victims—Javad Trew, Mariano Malvino, Eban Hale, Nicholas Spencer, Nicholas Gruber, or M.J.—reported the HASC assaults and robberies when they happened.

HASC could successfully extort motorcycles from former prospects and members—bikes worth tens of thousands of dollars—because those HASC members and associates knew exactly what would happen to them if they resisted. As just once example, the violent reputation of HASC is what enabled members to view the payment of $30,000 worth of marijuana for protection as a "gift," instead of extortion.

**The Need for General Deterrence**

The Court needs to impose lengthy sentences for the Group One defendants, like Wendt, for RICO conspiracy and the related crimes not only to incapacitate and deter these individuals, but for general deterrence as well.

General deterrence matters in criminal cases. For instance, a 30-year sentence for a person who assaulted the family member of a government leader serves as a deterrent to people who would use violence for political ends. As the Court saw in this case, the arrest and charging of HASC members, including leaders like Nelson, Russell Ott, Raymond Foakes, and prominent HASC associates like Wendt, created a virtuous circle. The Court heard from crime victims who were so terrified of retribution that they didn't seek medical treatment for serious injuries. In the Group Two trial, the Court heard from a person who had been beaten for speaking with Raymond Foakes' former girlfriend. Because the Hells Angels were involved, he refused to identify his attacker—HASC member Jeremy Greer, who was arrested near the scene—and for months afterward, he inspected his vehicle, looking for

bombs. However, after this case was charged, witnesses became more willing, or at least less resistant, to talk about what HASC had done to them. Seeing that action was being taken against HASC encouraged people to come forward. The charges lessened the sense of impunity, and other members of the public were willing to share what HASC had done to them as well.

A sentence that reflects the violent and dangerous nature of HASC will send a similar message to the community. Criminal enterprises like HASC are a serious threat to the public, and the Court should treat them as such by deterring others from associating with it or supporting its criminal work.

**Defendant Wendt's Conduct**

The Silva murder is the clearest and most serious example of Wendt's propensity for violence as a Hells Angel. As the evidence demonstrated, Wendt was responsible for getting the murder conspiracy started, as he was furious at Silva for threatening to kill a Boston Hells Angel when Silva and a group of Fresno Hells Angels and others were in Laconia, New Hampshire in June 2014. It was Wendt, together with co-defendant and Boston Hells Angels president Christopher Ranieri, who decided that Silva's conduct was so offensive that he "had to go," that he had to be killed. Soon after he and the Fresno contingent returned to California, Wendt had a meeting in Antioch with HASC president Nelson about Silva. At that meeting, Wendt advocated for Silva's murder, stressing that Silva had been causing too many problems; that he had been assaulting too many friends of Hells Angels members; and that his death threat in Laconia was effectively the last straw. In short, Silva had to disappear. Nelson agreed, and the wheels of Silva's murder conspiracy were set in motion.

Once that decision was made, Nelson's efforts to handle Silva himself proved ineffective, and Nelson turned to Wendt for help. The conspirators drafted a plan where Silva would be lured to the Fresno clubhouse under the pretense of resolving his issues with Wendt and others. Once there, he would be killed, and his body would be incinerated. And that is what happened on July 15-16, 2014.

The Court and the jury heard testimony that when Joseph Hardisty travelled to Fresno after the murder, he met with Wendt at the Fresno clubhouse, and Wendt reenacted how he killed Silva. Hardisty described Wendt as "kind of laughing" and "giggling" as he recounted the murder. He bragged about how he tricked Silva into looking down for some marijuana under the stage of the Fresno clubhouse, at which time Wendt shot him in the head. Hardisty indicated that Wendt seemed proud of what he had

done and how he had done it. When Hardisty later fell into bad standing with the Hells Angels, Wendt threatened to kill Hardisty, too.

The Court can also consider how Wendt arranged to obstruct justice to aid HASC in the killing of Silva by arranging to incinerate his body at a crematory. In many ways, this magnified the harm to the Silva family, because they confronted not only the loss of their son, their husband, and their father, but they were tormented by the uncertainty of what had happened to him and by the false hope that he might someday return.

Although the jury did not hear this evidence, the Court is familiar with the fact that during Wendt's leadership, the Fresno Hells Angels, through Merl Hefferman, used the same method to disappear bodies at least three more times. *See* ECF No. 3600 (U.S. Sentencing Memo, Hefferman). As the Court heard, there is a correspondence between those illegal cremations and the disappearances of missing Hells Angels, some of whom were last seen alive when they entered the Fresno clubhouse. *Id.*

Wendt was not simply a driver of violence for HASC through the Silva homicide. The jury also heard how Wendt supplied weapons for HASC-attended events. During a run to Arizona during Steve Verhagen's time with HASC in 2015, he saw Wendt and others loading a cache of weapons from their truck through the window of their motel room—an AR-style rifle, a shotgun, and some pistols. Verhagen also reported that he was present when Wendt came to the HASC clubhouse and a bag containing an AR rifle and a large capacity drum magazine fell out his truck.

Finally, Verhagen reported that at a gas station during the Arizona run, Wendt found a motorcyclist who had earlier passed the Hells Angels pack. In response to this supposed show of disrespect, Wendt beat him so savagely that Verhagen had to obstruct the view of a family with a young child who witnessed it, as the child screamed that Wendt was going to kill this person.

Of the three defendants charged with the Silva homicide, Wendt has the most significant criminal history, and it features multiple acts of violence. Paragraph 78 of the PSR features Wendt's arrest for participating in the 2001 Laughlin riot between the Hells Angels and the Mongols, a melee that left three people dead and dozens injured. Although the charges were dismissed when the case effectively fell apart, the Court can consider that Wendt was present at the event, and as a Hells Angel, he was obligated to take action during it.

The PSR details a 2003 conviction Wendt has for assault with a deadly weapon, for which he received a sentence of four years.[1] PSR ¶ 74. The facts underlying this incident are illustrative of Wendt's conduct and show remarkable similarities to the HASC actions—such as the savage assaults of Javad Trew, Mariano Malvino, and Troy Conte—presented in this case. In March 2001, members of the Fresno Hells Angels and Wendt, including his father David Wendt, went to the clubhouse of the Exiled (another motorcycle club) to shut down that club. They forcibly took stereos, security equipment, kitchen equipment, and other items with a total value of more than $2,000. *See Lobretto*, 2013 WL 509160, at *4. A few days after that, twelve people including Wendt showed up at the Exiled clubhouse again and severely assaulted two people. *See id.* One of the victims was beaten so badly, including being kicked in the head while he was on the ground, that he suffered a fracture of his right cheek and another fracture of a bone in his face, which required surgical repair and fixing with two titanium plates and several screws. *Id.* at *6. The victims were told not to report the incident or go to the hospital or they would be killed. *Id.* at *5. One of the victims was told by one of the Hells Angels something to the effect of: "you know who we are, we're everywhere, you know we'll find you, we'll kill you". *Id.* Although Wendt was not specifically identified as one of the assailants in the factual discussion of the *Lobretto* opinion, he was present at the events; he pleaded guilty to a felony assault; and he was sentenced to four years in prison.

Wendt played a leading role in the planning for the Silva killing and was ultimately the person who executed it. In his close connection to HASC, he provided an example of preparation for violence through his possession of heavy weaponry and making it available to the enterprise, and he put violence in action by attacking members of the public and by killing one of his brother Hells Angels. As with

---

[1] Although the PSR does not report the facts of that offense, it is likely the Hells Angels-related incident that the government brought to the Court's attention during Wendt's efforts to be released. *See* ECF No. 1711. In that filing, the government discussed the case of *Lobretto v. Sisto*, 08-CV-0080–LJO–JLT, 2013 WL 509160 (E.D. Cal. Feb. 12, 2013). *Lobretto* was a habeas action brought by a Fresno Hells Angel, who, together with Wendt and others, committed a violent assault and robbery on behalf of the enterprise. The *Lobretto* opinion discusses search warrants that were executed in July 2001, and the conviction in paragraph 74 of the PSR stemmed from a July 13, 2001 arrest of Wendt. Thus, the opinion likely details the events related to that conviction.

US SENTENCING MEMORANDUM                8
17-CR-0533 EMC, *United States v. Brian Wendt*

Nelson and Ott, Wendt's murder of Joel Silva represents one of the most serious crimes the Court must address, and his conduct merits the most serious sentence it can impose.

## CONCLUSION

For the foregoing reasons, and for all the reasons set forth in the two trials in this case, the government respectfully submits that the Court should sentence Defendant Brian Wendt to a term of life for Counts One and Three and a concurrent term of 120 months for Count Two.

DATED:  June 6, 2024                                    Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

__/s/ *Kevin J. Barry*_____
KEVIN J. BARRY
AJAY KRISHNAMURTHY
Assistant United States Attorneys